Marya S. NORMAN–BLOODSAW; Eulalio R. Fuentes; Vertis B. Ellis; Mark E. Covington; John D. Randolph; Adrienne L. Garcia; and Brendolyn B. Smith, Plaintiffs–Appellants,

v.

LAWRENCE BERKELEY LABORATORY; Charles V. Shank, Director of Lawrence Berkeley Laboratory; Henry H. Stauffer, M.D.; Lisa Snow, M.D.; T.F. Budinger, M.D.; William G. Donald, Jr., M.D.; Federico Pena, Secretary of the Department of Energy; *; and The Regents Of the University of California, a non-profit public corporation, Defendants–Appellees.

No. 96–16526.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 10, 1997.

Decided Feb. 3, 1998.

---

* Federico Pena has been substituted for his predecessor in office, Hazel O'Leary, pursuant to Fed. R.App. P. 43(c)(1).

Vicki Laden, Claudia Center, Jennifer Middleton, and William C. McNeill, III, Employment Law Center, San Francisco, California, for plaintiffs-appellants.

Douglas H. Barton, Hanson, Bridgett, Marcus, Vlahos & Rudy, San Francisco, California, for defendants-appellees Lawrence Berkeley Laboratory and The Regents of the University of California.

Sushma Soni, United States Department of Justice, Washington, DC, for defendant-appellee Federico Pena.

Craig M. Cornish, Cornish and Dell–Olio, Colorado Springs, Colorado, Lewis L. Maltby, Rebecca Kramnick, ACLU, New York City, for amicus curiae National Employment Lawyers Association, The American Civil Liberties Union, and the American Public Health Association.

Michael Avery, Theresa Finn Dever, Jerry Cohen, Perkins, Smith & Cohen, Boston, Massachusetts, for amicus curiae Council for Responsible Genetics.

Michael Harris, Nancy M. Stuart, San Francisco, California, for amicus curiae Lawyers' Committee for Civil Rights.

Before: REINHARDT, T.G. NELSON, and HAWKINS, Circuit Judges.

REINHARDT, Circuit Judge:

This appeal involves the question whether a clerical or administrative worker who undergoes a general employee health examination may, without his knowledge, be tested for highly private and sensitive medical and genetic information such as syphilis, sickle cell trait, and pregnancy.

Lawrence Berkeley Laboratory is a research institution jointly operated by state and federal agencies. Plaintiffs-appellants, present and former employees of Lawrence, allege that in the course of their mandatory employment entrance examinations and on subsequent occasions, Lawrence, without their knowledge or consent, tested their blood and urine for intimate medical conditions—namely, syphilis, sickle cell trait, and pregnancy. Their complaint asserts that this testing violated Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), and their right to privacy as guaranteed by both the United States and

State of California Constitutions. The district court granted the defendants-appellees' motions for dismissal, judgment on the pleadings, and summary judgment on all of plaintiffs-appellants' claims. We affirm as to the ADA claims, but reverse as to the Title VII and state and federal privacy claims.

## BACKGROUND

Plaintiffs Marya S. Norman–Bloodsaw, Eulalio R. Fuentes, Vertis B. Ellis, Mark E. Covington, John D. Randolph, Adrienne L. Garcia, and Brendolyn B. Smith are current and former administrative and clerical employees of defendant Lawrence Berkeley Laboratory ("Lawrence"), a research facility operated by the appellee Regents of the University of California pursuant to a contract with the United States Department of Energy (the Department). Defendant Charles V. Shank is the director of Lawrence, and defendants Henry H. Stauffer, Lisa Snow, T.F. Budinger, and William G. Donald, Jr., are all current or former physicians in its medical department. The named defendants are sued in both their official and individual capacities.[1]

The Department requires federal contractors such as Lawrence to establish an occupational medical program. Since 1981, it has required its contractors to perform "preplacement examinations" of employees as part of this program, and until 1995, it also required its contractors to offer their employees the option of subsequent "periodic health examinations." The mandatory preplacement examination occurs after the offer of employment but prior to the assumption of job duties. The Department actively oversees Lawrence's occupational health program, and, prior to 1992, specifically required syphilis testing as part of the preplacement examination.

With the exception of Ellis, who was hired in 1968 and underwent an examination after beginning employment, each of the plaintiffs received written offers of employment expressly conditioned upon a "medical

---

**1.** Plaintiffs named Hazel O'Leary, former Secretary of the Department of Energy, as a defendant in both her personal and official capacities. Because plaintiffs expressly conceded at oral argument that the claims against O'Leary in her

personal capacity are meritless, we affirm the dismissal of those claims. As to the remaining claims against her, Federico Pena, her successor in office, has been substituted as a defendant in his official capacity. *See supra* note *.

examination," "medical approval," or "health evaluation." All accepted these offers and underwent preplacement examinations, and Randolph and Smith underwent subsequent examinations as well.[2] In the course of these examinations, plaintiffs completed medical history questionnaires and provided blood and urine samples. The questionnaires asked, *inter alia*, whether the patient had ever had any of sixty-one medical conditions, including "[s]ickle cell anemia,"[3] "[v]enereal disease," and, in the case of women, "[m]enstrual disorders."[4]

The blood and urine samples given by all employees during their preplacement examinations were tested for syphilis; in addition, certain samples were tested for sickle cell trait; and certain samples were tested for pregnancy. Lawrence discontinued syphilis testing in April 1993, pregnancy testing in December 1994, and sickle cell trait testing in June 1995. Defendants assert that they discontinued syphilis testing because of its limited usefulness in screening healthy populations, and that they discontinued sickle cell trait testing because, by that time, most African–American adults had already been tested at birth. Lawrence continues to perform pregnancy testing, but only on an optional basis. Defendants further contend that "for many years" signs posted in the health examination rooms and "more recently" in the reception area stated that the tests at issue would be administered.

Following receipt of a right-to-sue letter from the EEOC, plaintiffs filed suit in September 1995 on behalf of all past and present Lawrence employees who have ever been subjected to the medical tests at issue. Plaintiffs allege that the testing of their blood and urine samples for syphilis, sickle cell trait, and pregnancy occurred without their knowledge or consent, and without any subsequent notification that the tests had been conducted. They also allege that only black employees were tested for sickle cell trait and assert the obvious fact that only female employees were tested for pregnancy.[5] Finally, they allege that Lawrence failed to provide safeguards to prevent the dissemination of the test results. They contend that they did not discover that the disputed tests had been conducted until approximately January 1995, and specifically deny that they observed any signs indicating that such tests would be performed. Plaintiffs do not allege that the defendants took any subsequent employment-related action on the basis of their test results, or that their test results have been disclosed to third parties.

On the basis of these factual allegations, plaintiffs contend that the defendants violated the ADA by requiring, encouraging, or assisting in medical testing that was neither job-related nor consistent with business necessity. Second, they contend that the defendants violated the federal constitutional right to privacy by conducting the testing at issue, collecting and maintaining the results of the testing, and failing to provide adequate safeguards against disclosure of the results. Third, they contend that the testing violated their right to privacy under Article I, § 1 of the California Constitution. Finally, plaintiffs contend that Lawrence and the Regents

---

2. Plaintiffs-appellants underwent examinations on the following occasions: Norman–Bloodsaw on December 16 or 17, 1986; Fuentes on April 28 or 29, 1992; Ellis in June 17, 1968, November 9, 1970, August 7, 1972, April 22, 1974, November 17, 1979, and May 22, 1984; Covington on January 9, 1992; Randolph on July 23, 1981, and September 10, 1984; Garcia on August 16, 1993; and Smith on December 12, 1985, and February 29, 1988.

3. Sickle cell *anemia* is a physical affliction in which a large proportion or majority of an individual's red blood cells become sickle-shaped. *Webster's Third New International Dictionary* 2111 (1976). Sickle cell *trait* is a genetic condition in which an individual carries the gene that causes sickle cell anemia. *Id.* The sickle cell gene is only semi-dominant: if the carrier of the gene is heterozygous (meaning that the gene is paired with a non-sickle cell gene), some of his or her red blood cells may sickle, but usually not to a sufficient degree to result in actual sickle cell anemia. *Id.*

4. The section of the questionnaire also asks women if they have ever had abnormal pap smears and men if they have ever had prostate gland disorders.

5. Their proposed first amended complaint, which plaintiffs did not file in light of the district court's rulings, contains the additional allegation that Lawrence singled out black and Latino employees for repeated syphilis testing.

violated Title VII by singling out black employees for sickle cell trait testing and by performing pregnancy testing on female employees generally.

The state defendants moved for judgment on the pleadings or, in the alternative, for summary judgment. The sole federal defendant (the "Secretary"), then-Secretary of Energy Hazel O'Leary, moved to dismiss the various claims against her for lack of subject matter jurisdiction and for failure to state a claim. Turning first to the ADA claims,[6] the district court reasoned that because the medical questionnaires inquired into information such as venereal disease and reproductive status, plaintiffs were on notice at the time of their examinations that Lawrence was engaging in medical inquiries that were neither job-related nor consistent with business necessity. Thus, given that the most recent examination occurred over two years before the filing of the complaint, the district court held that all of the ADA claims were time-barred. It also rejected the argument that storage of the test results constitutes a "continuing violation" of the ADA that tolls the limitations period.

The district court next concluded that the federal privacy claims were also time-barred and, in the alternative, failed on the merits. On the grounds that the tests were "part of a comprehensive medical examination to which plaintiffs had consented," and that plaintiffs had completed a medical history form of "highly personal questions" that included inquiries concerning "venereal disease," "sickle cell anemia," and "menstrual problems," it concluded that plaintiffs were aware at the time of their examinations "of sufficient facts to put them on notice" that their blood and urine would be tested for syphilis, sickle cell trait, and pregnancy, and that their claims were thus time-barred. The district court then held, in the alternative, that the testing had not violated plaintiffs' due process right to privacy. Relying again on the fact that the tests were performed as part of a general medical examination "that covered the same areas as the tests themselves," it concluded that any "additional incremental intrusion" from the tests was so minimal that no consti-

tutional violation could have occurred despite defendants' failure to identify "an undisputed legitimate governmental purpose" for the tests.

Finally, the district court held that the Title VII claims, even if viable, were time-barred for the same reasons as were the privacy and ADA claims. It also concluded that plaintiffs had failed to state a cognizable Title VII claim, reasoning that plaintiffs had "neither alleged nor shown any connection between these discontinued confidential tests and [their] employment terms or conditions, either in the past or in the future"; and finding that "[p]laintiffs' charge of stigmatic harm, stripped of hyperbole, speculation, and conjecture ... evaporates."

This appeal followed.

## DISCUSSION

### I. Statute of Limitations

■ The district court dismissed all of the claims on statute of limitations grounds because it found that the limitations period began to run at the time the tests were taken, in which case each cause of action would be time-barred. Federal law determines when the limitations period begins to run, and the general federal rule is that "a limitations period begins to run when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Trotter v. International Longshoremen's & Warehousemen's Union*, 704 F.2d 1141, 1143 (9th Cir.1983). Because the district court resolved the statute of limitations question on summary judgment, we must determine, viewing all facts in the light most favorable to plaintiffs and resolving all factual ambiguities in their favor, whether the district court erred in determining that plaintiffs knew or should have known of the particular testing at issue when they underwent the examinations.

■ We find that whether plaintiffs knew or had reason to know of the specific testing turns on material issues of fact that can only be resolved at trial. Plaintiffs' declarations clearly state that at the time of the examina-

---

**6.** The district court observed, and plaintiffs do not dispute, that Garcia and Fuentes were the only named plaintiffs to have undergone exami-

nations after the effective date of the ADA, and hence the only plaintiffs who could assert ADA claims.

tion they did not know that the testing in question would be performed, and they neither saw signs nor received any other indications to that effect.[7] The district court had three possible reasons for concluding that plaintiffs knew or should have expected the tests at issue: (1) they submitted to an occupational preplacement examination; (2) they answered written questions as to whether they had had "venereal disease," "menstrual problems," or "sickle cell anemia"; and (3) they voluntarily gave blood and urine samples.[8] Given the present state of the record, these facts are hardly sufficient to establish that plaintiffs either knew or should have known that the particular testing would take place.

The question of what tests plaintiffs should have expected or foreseen depends in large part upon what preplacement medical examinations usually entail, and what, if anything, plaintiffs were told to expect. The record strongly suggests that plaintiffs' submission to the exam did not serve to afford them notice of the particular testing involved. The letters that plaintiffs received informed them merely that a "medical examination," "medical approval," or "health evaluation" was an express condition of employment. These letters did *not* inform plaintiffs that they would be subjected to comprehensive diagnostic medical examinations that would inquire into intimate health matters bearing no relation to their responsibilities as administrative or clerical employees.

The record, indeed, contains considerable evidence that the manner in which the tests were performed was inconsistent with sound medical practice. Plaintiffs introduced before the district court numerous expert declarations by medical scholars roundly condemning Lawrence's alleged practices and explaining, *inter alia,* that testing for syphilis, sickle cell trait, and pregnancy is *not* an appropriate part of an occupational medical examination and is rarely if ever done by employers as a matter of routine; that Lawrence lacked any reasonable medical or public health basis for performing these tests on clerical and administrative employees such as plaintiffs; and that the performance of such tests without explicit notice and informed consent violates prevailing medical standards.[9] These experts further agreed that "generally accepted standards of occupational medicine" require employers to inform their employees of the tests to be performed, to specify whether the tests are a condition of employment, and to provide notification of the results. Defendants counter that the "tests [for sickle cell trait] were consistent with good medical practices," Declaration of Henry Stauffer, M.D., ¶ 12, and that testing for syphilis in a preventive health exam is an accepted practice. These factual disagreements over the objective medical reasonableness of the specific tests can be resolved only at trial. For summary judgment purposes, foreseeability cannot be established on the

7. Although Lawrence has submitted a declaration stating that signs were posted that advised that the tests in question would be administered, it does not contend that the alleged posting of these signs put any of the plaintiffs on notice of the relevant testing. This contention would, of course, in light of the plaintiffs' declarations, merely raise an additional issue of fact to be resolved at trial.

8. The district court did not specify whether, in its view, plaintiffs actually knew of the testing at the time of their respective examinations, or whether they merely had reason to know; nor did it identify the particular facts that it deemed sufficient to place plaintiffs on notice of the alleged violations.

9. *See, e.g.,* Declaration of Mark Cullen, M.D., Professor of Medicine and Public Health and Director of the Occupational Medicine Program at Yale University ¶ 6 ("No conceivable justification could exist for screening office or adminis-

trative employees for sickle cell [trait] or pregnancy. There is no justification for an employer including syphilis in a general medical examination."); *id.* ¶ 7 ("I am not aware of any employer which has routinely screened employees for pregnancy or sickle cell [trait], [or] for syphilis."); Declaration of Neil Holtzman, M.D., Professor of Pediatrics, The Johns Hopkins School of Medicine ¶ 7 ("[I]t is not acceptable medical practice for employers to conduct genetic screening of employees unless there is a high probability that the conditions detected ... will affect the ability of the worker to perform the job [or] the job poses a significant threat to the worker or others."); Declaration of Jacqueline Moline, M.D., M.Sc., Instructor in Environmental and Occupational Medicine, Mount Sinai Medical Center, ¶ 5 ("None of these tests should have been done on a routine basis, or as part of an occupational medical examination unrelated to any particular exposure. Administration of these tests was not consistent with good medical practice in occupational medicine.").

ground that the plaintiffs were required to submit to a general medical examination.

The district court also appears to have reasoned that plaintiffs knew or had reason to know of the tests because they were asked questions on a medical form concerning "venereal disease," "sickle cell anemia," and "menstrual disorders," and because they gave blood and urine samples. The fact that plaintiffs acquiesced in the minor intrusion of checking or not checking three boxes on a questionnaire does not mean that they had reason to expect further intrusions in the form of having their blood and urine tested for specific conditions that corresponded tangentially if at all to the written questions. First, the entries on the questionnaire were neither identical to nor, in some cases, even suggestive of the characteristics for which plaintiffs were tested. For example, sickle cell trait is a genetic condition distinct from actually having sickle cell anemia, and pregnancy is not considered a "menstrual disorder" or a "venereal disease." Second, and more important, it is not reasonable to infer that a person who answers a questionnaire upon personal knowledge is put on notice that his employer will take intrusive means to verify the accuracy of his answers. There is a significant difference between answering on the basis of what you know about your health and consenting to let someone else investigate the most intimate aspects of your life.[10] Indeed, a reasonable person could conclude that by completing a written questionnaire, he has reduced or eliminated the need for seemingly redundant and even more intrusive laboratory testing in search of highly sensitive and non-job-related information.

Furthermore, if plaintiffs' evidence concerning reasonable medical practice is to be credited, they had no reason to think that tests would be performed without their consent simply because they had answered some questions on a form and had then, in addition, provided bodily fluid samples: Plaintiffs could reasonably have expected Lawrence to seek their consent before running any tests not usually performed in an occupational health exam—particularly tests for intimate medical conditions bearing no relationship to their responsibilities or working conditions as clerical employees. The mere fact that an employee has given a blood or urine sample does not provide notice that an employer will perform any and all tests on that specimen that it desires,—no matter how invasive— particularly where, as here, the employer has yet to offer a valid reason for the testing.

In sum, the district court erred in holding as a matter of law that the plaintiffs knew or had reason to know of the nature of the tests as a result of their submission to the preemployment medical examinations.[11] Because the question of what testing, if any, plaintiffs had reason to expect turns on material factual issues that can only be resolved at trial, summary judgment on statute of limitations grounds was inappropriate with respect to the causes of action based on an invasion of privacy in violation of the Federal and California Constitutions, and also on the Title VII claims.[12]

## II. Federal Constitutional Due Process Right of Privacy

The district court also ruled, in the alternative, on the merits of all of plaintiffs' claims except the ADA claims. We first examine its ruling with respect to the claim for violation of the federal constitutional right to privacy. While acknowledging that the government had failed to identify any

10. Under the district court's and defendants' reasoning, answering a question such as, "Do you know if you carry the HIV-virus?," or even, "Do you know if you have any sexually transmitted diseases?," as part of a pre-employment physical, and then giving a blood sample as part of that same test, would erase all privacy rights one has to *not* being tested for the HIV-virus.

11. Although Covington's declaration states that he "requested and received" his medical file in 1992, he also states that he "did not open the envelope containing the file after receiving it." That Covington received his medical records in

1992 does not, therefore, resolve material issues of fact as to whether he learned of the tests before 1995.

12. As to the Title VII race discrimination claims, even if the plaintiffs *had known* that such tests were taken, they would not have known that they were not uniformly administered and thus would not have known the facts that form the basis of those claims.

Because the ADA claims fail on the merits, as discussed below, we do not determine whether the district court erred in dismissing those claims on statute of limitations grounds.

"undisputed legitimate governmental purpose" for the three tests, the district court concluded that no violation of plaintiffs' right to privacy could have occurred because any intrusions arising from the testing were de minimis in light of (1) the "large overlap" between the subjects covered by the medical questionnaire and the three tests and (2) the "overall intrusiveness" of "a full-scale physical examination." We hold that the district court erred.

■ The constitutionally protected privacy interest in avoiding disclosure of personal matters clearly encompasses medical information and its confidentiality. *Doe v. Attorney General of the United States,* 941 F.2d 780, 795 (9th Cir.1991) (citing *United States v. Westinghouse Elec. Corp.,* 638 F.2d 570, 577 (3d Cir.1980)); *Roe v. Sherry,* 91 F.3d 1270, 1274 (9th Cir.1996); *see also Doe v. City of New York,* 15 F.3d 264, 267–69 (2d Cir.1994). Although cases defining the privacy interest in medical information have typically involved its disclosure to "third" parties, rather than the collection of information by illicit means, it goes without saying that the *most basic* violation possible involves the performance of unauthorized tests—that is, the non-consensual retrieval of previously unrevealed medical information that may be unknown even to plaintiffs. These tests may also be viewed as searches in violation of Fourth Amendment rights that require Fourth Amendment scrutiny. The tests at issue in this case thus implicate rights protected under both the Fourth Amendment and the Due Process Clause of the Fifth or Fourteenth Amendments. *Yin v. California,* 95 F.3d 864, 870 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 955, 136 L.Ed.2d 842 (1997).

■ Because it would not make sense to examine the collection of medical information under two different approaches, we generally "analyze[ ] [medical tests and examinations] under the rubric of [the Fourth] Amendment." *Id.* at 871 & n. 12. Accordingly, we must balance the government's interest in conducting these particular tests against the plaintiffs' expectations of privacy. *Id.* at 873. Furthermore, "application of· the balancing test requires not only considering the degree of intrusiveness and the state's interests in requiring that intrusion, but also 'the efficacy

of this [the state's] means for meeting' its needs." *Id.* (quoting *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 660, 115 S.Ct. 2386, 2394, 132 L.Ed.2d 564 (1995)).

The district court erred in dismissing the claims on the ground that any violation was de minimis, incremental, or overlapping. The latter two grounds are actually just the court's explanations for its adoption of its "de minimis" conclusion. They are not in themselves reasons for dismissal. Nor if the violation is otherwise significant does it become insignificant simply because it is overlapping or incremental. We cannot, therefore, escape a scrupulous examination of the nature of the violation, although we can, of course, consider whether the plaintiffs have in fact consented to any part of the alleged intrusion.

■ One can think of few subject areas more personal and more likely to implicate privacy interests than that of one's health or genetic make-up. *Doe,* 15 F.3d at 267 ("Extension of the right to confidentiality to personal medical information recognizes there are few matters that are quite so personal as the status of one's health"); *see Vernonia Sch. Dist. 47J,* 515 U.S. at 658, 115 S.Ct. at 2393 (noting under Fourth Amendment analysis that "it is significant that the tests at issue here look only for ·drugs, and not for whether the student is·, for example, epileptic, pregnant, or diabetic"). Furthermore, the facts revealed by the tests are highly sensitive, even relative to other medical information. With respect to the testing of plaintiffs for syphilis and pregnancy, it is well established in this circuit "that the Constitution prohibits unregulated, unrestrained employer inquiries into. personal sexual matters that have no bearing on job performance." *Schowengerdt v. General Dynamics Corp.,* 823 F.2d 1328, 1336 (9th Cir.1987) (citing *Thorne v. City of El Segundo,* 726 F.2d 459, 470 (9th Cir.1983)). The fact that one has syphilis is an intimate matter that pertains to one's sexual history and may invite tremendous amounts of social stigma. Pregnancy is likewise, for many, an intensely private ·matter, which also may pertain to one's sexual history and often carries far-reaching societal implications. *See Thorne,* 726 F.2d at 468–

70; *Doe*, 15 F.3d at 267 (noting discrimination and intolerance to which HIV-positive persons are exposed). Finally, the carrying of sickle cell trait can pertain to sensitive information about family history and reproductive decisionmaking. Thus, the conditions tested for were aspects of one's health in which one enjoys the highest expectations of privacy.

■ As discussed above, with respect to the question of the statute of limitations, there was little, if any, "overlap" between what plaintiffs consented to and the testing at issue here. Nor was the additional invasion only incremental. In some instances, the tests related to entirely different conditions. In all, the information obtained as the result of the testing was qualitatively different from the information that plaintiffs provided in their answers to the questions, and was highly invasive. That one has consented to a general medical examination does not abolish one's privacy right not to be tested for intimate, personal matters involving one's health—nor does consenting to giving blood or urine samples,[13] or filling out a questionnaire. As we have made clear, revealing one's personal knowledge as to whether one has a particular medical condition has *nothing* to do with one's expectations about actually being tested for that condition. Thus, the intrusion was by no means *de minimis*.[14] Rather, if unauthorized, the testing constituted a significant invasion of a right that is of great importance, and labelling it minimal cannot and does not make it so.

■ Lawrence further contends that the tests in question, even if their intrusiveness is not de minimis, would be justified by an employer's interest in performing a general physical examination. This argument

fails because issues of fact exist with respect to whether the testing at issue is normally part of a general physical examination.[15] There would of course be no violation if the testing were authorized, or if the plaintiffs reasonably should have known that the blood and urine samples they provided would be used for the disputed testing and failed to object. However, as we concluded in Section I, material issues of fact exist as to those questions. Summary judgment in the alternative on the merits of the federal constitutional privacy claim was therefore incorrect.

### III. *Right to Privacy Under Article I, § 1 of the California Constitution*

With respect to the state privacy claims, defendants argue, as they did with respect to the federal privacy claims, that the intrusions occasioned by the testing were so minimal that the government need not demonstrate a legitimate interest in performing the tests. In the alternative, they argue that the intrusions were so minimal that plaintiffs' privacy interests were necessarily overcome by the government's interest in performing the preplacement examinations. We understand this argument to be essentially the same as the argument that these tests are a part of an ordinary general medical examination. Defendants urge no additional governmental interest but appear to rely entirely on the interest that any employer might assert in requiring potential employees to undergo general medical testing. The district court did not adopt either of the defendants' positions expressly but simply ruled that plaintiffs "could not proceed" because the "undisputed facts"—namely, completion of the medical questionnaire, consent to the preplacement examination, and the voluntary

---

**13.** Indeed, the Supreme Court has recognized that while the taking of a bodily fluid sample implicates one's privacy interests, "[t]he ensuing chemical analysis of the sample to obtain physiological data is a *further* intrusion of the tested employee's privacy interests." *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 616, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989) (emphasis added).

**14.** The district court and defendants improperly rely on *Plowman v. United States Dep't of Army*, 698 F.Supp. 627 (E.D.Va.1988). While *Plowman* concludes that an HIV-test is "significantly less

invasive" when conducted on a blood sample already given for other purposes, it still engages in proper Fourth Amendment analysis by weighing this intrusion against governmental justifications. *Id.* at 636–37.

**15.** Lawrence has not identified a single interest in performing the tests in question other than that they are part of generally accepted medical practice. Thus, on the present record, if the plaintiffs were to prevail on the statute of limitations issue, they would also prevail with respect to the federal privacy claim.

giving of blood and urine samples—showed that the tests had inflicted "only a de minimis privacy invasion."

 To assert a cause of action under Article I, § 1 of the California Constitution, one must establish three elements: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy under the circumstances; and (3) conduct by the defendant that amounts to a "serious invasion" of the protected privacy interest. *Loder v. City of Glendale,* 14 Cal.4th 846, 59 Cal.Rptr.2d 696, 927 P.2d 1200, 1228 (1997) (quoting *Hill v. National Collegiate Athletic Ass'n,* 7 Cal.4th 1, 26 Cal.Rptr.2d 834, 865 P.2d 633, 657 (1994), *cert. denied,* ── U.S. ──, 118 S.Ct. 44, 139 L.Ed.2d 11 (1997)). These elements must be "viewed simply as 'threshold elements,'" after which the court must conduct a balancing test between the "countervailing interests" for the conduct in question and the intrusion on privacy resulting from the conduct.[16] A showing of "countervailing interests" may, in turn, be rebutted by a showing that there were "feasible and effective alternatives" with a "lesser impact on privacy interests." *Hill,* 26 Cal.Rptr.2d 834, 865 P.2d at 657.

 For much the same reasons as we have discussed above with respect to the statute of limitations and federal privacy claims, the district court erred in dismissing the state constitutional privacy claim. The only possible difference between the state claim and the federal claim is the threshold requirement that the invasion be serious, and for purposes of summary judgment, that requirement has been more than met.[17] For the reasons discussed above, we find that material issues of fact exist with respect to whether the defendants had any interest at all in obtaining the information and whether plaintiffs had a reasonable expectation of privacy under the circumstances. Both these questions involve a factual dispute regarding the ordinary or accepted medical practice regarding general or pre-employment medical exams. Accordingly, the district court also erred in dismissing the state constitutional privacy claims.

## IV. *Title VII Claims*

The district court also dismissed the Title VII counts on the merits on the ground that plaintiffs had failed to state a claim because the "alleged classifications, standing alone, do not suffice to provide a cognizable basis for relief under Title VII" and because plaintiffs had neither alleged nor demonstrated how these classifications had adversely affected them.

Section 703(a) of Title VII of the Civil Rights Act of 1964 provides that it is unlawful for any employer:

(1) to fail or refuse to hire or to discharge any individual, or *otherwise to discriminate* against any individual with respect to his compensation, *terms, conditions,* or privileges of employment, because of such individual's race, color, religion, sex, or national origin; *or*

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a) (emphasis added). The Pregnancy Discrimination Act further provides that discrimination on the basis of "sex" includes discrimination "on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). "In accordance with Congressional intent, the above language is to be read in the broadest possible terms. The intent of Congress was not

---

**16.** The California Supreme Court has emphasized that *Hill* did not "adopt[ ] a sweeping new rule under which a challenge to conduct that significantly affects a privacy interest protected by the state Constitution may be rejected without any consideration of either the legitimacy or strength of the defendant's justification for the conduct." *American Academy of Pediatrics v. Lungren,* 16 Cal.4th 307, 66 Cal.Rptr.2d 210, 940 P.2d 797, 812 (1997).

**17.** Under California law, a legally recognizable privacy interest arises from the sort of information revealed by the tests at issue. *See Loder,* 59 Cal.Rptr.2d 696, 927 P.2d at 1232 (finding procedure that, *inter alia,* "authorizes the administering entity to test the sample in order to acquire information concerning the internal state of the tested individual's body" to clearly intrude upon state privacy interests).

to list specific discriminatory practices, nor to definitively set out the scope of the activities covered." EEOC Compliance Manual (CCH) § 613.1, at ¶ 2901 (citing *Rogers v. EEOC*, 454 F.2d 234 (5th Cir.1971)).

Despite defendants' assertions to the contrary, plaintiffs' Title VII claims fall neatly into a Title VII framework: Plaintiffs allege that black and female employees were singled out for additional nonconsensual testing and that defendants thus selectively invaded the privacy of certain employees on the basis of race, sex, and pregnancy. The district court held that (1) the tests did not constitute discrimination in the "terms" or "conditions" of plaintiffs' employment; and that (2) plaintiffs have failed to show any "adverse effect" as a result of the tests. It also granted the plaintiffs leave to amend their complaint to show adverse effect.

█ Under § 2000e–2(a)(1), *supra*, an employer who "otherwise ... discriminate[s]" with respect to the "terms" or "conditions" of employment on account of an illicit classification is subject to Title VII liability. It is well established that Title VII bars discrimination not only in the "terms" and "conditions" of ongoing employment, but also in the "terms" and "conditions" under which individuals may *obtain* employment. *See, e.g., Griggs v. Duke Power Co.*, 401 U.S. 424, 432–36, 91 S.Ct. 849, 854–56, 28 L.Ed.2d 158 (1971) (facially neutral educational and testing requirements that are not reasonable measures of job performance and have disparate impact on hiring of minorities violate Title VII). Thus, for example, a requirement of preemployment health

examinations imposed *only* on female employees, or a requirement of preemployment background security checks imposed only on black employees, would surely violate Title VII.[18]

█ In this case, the term or condition for black employees was undergoing a test for sickle cell trait; for women it was undergoing a test for pregnancy.[19] It is not disputed that the preplacement exams were, literally, a condition of employment: the offers of employment stated this explicitly. Thus, the employment of women and blacks at Lawrence was conditioned in part on allegedly unconstitutional invasions of privacy to which white and/or male employees were not subjected. An additional "term or condition" requiring an unconstitutional invasion of privacy is, without doubt, actionable under Title VII. Furthermore, even if the intrusions did not rise to the level of unconstitutionality, they would still be a "term" or "condition" based on an illicit category as described by the statute and thus a proper basis for a Title VII action.[20] Thus, the district court erred in ruling on the pleadings that the plaintiffs had failed to assert a proper Title VII claim under § 2000e–2(a)(1).

█ The district court also erred in finding as a matter of law that there was no "adverse effect" with respect to the tests as required under § 2000e–2(a)(2). The unauthorized obtaining of sensitive medical information on the basis of race or sex would in itself constitute an "adverse effect," or injury, under Title VII. Thus, it was error to rule that as a matter of law no "adverse effect"

---

**18.** This would be the case even though the extra requirement had not caused any of the employees not to be hired. *See Hashimoto v. Dalton*, 118 F.3d 671, 676 (9th Cir.1997) (holding that unlawful personnel action that "turn[s] out to be inconsequential goes to the issue of damages, not liability"); *EEOC v. Hacienda Hotel*, 881 F.2d 1504 (9th Cir.1989).

**19.** *See supra* note 5 regarding the proposed amended complaint alleging the performance of repeated syphilis testing on black and Latino employees. In light of our holdings, the amendment would clearly be appropriate following remand.

**20.** This is not to say that a Title VII action would necessarily lie in a case involving two different but *equivalent* tests administered to men and

women. Thus, for example, if test were given to men for testicular cancer and to women for ovarian cancer, there would probably be no cause of action under Title VII. In the case of a pregnancy test for women, however, it is doubtful that an equivalent test *could* be offered to men.

An exception of course exists for pregnancy testing in those "instances in which ... pregnancy actually interferes with the employee's ability to perform the job." *International Union, United Auto., Aerospace, & Agric. Implement Workers, UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 204, 111 S.Ct. 1196, 1206, 113 L.Ed.2d 158 (1991). No such exception is asserted here.

could arise from a classification that singled out particular groups for unconstitutionally invasive, non-consensual medical testing, and the district court erred in dismissing the Title VII claims on this ground as well.

## V. *The ADA Claims*

Plaintiffs may challenge only the medical examinations that occurred "on or after January 26, 1992," which is the effective date of the ADA for public entities.[21] The only plaintiffs who underwent any examinations or testing on or after that date are Fuentes and Garcia, who were tested in April 1992 and August 1993, respectively. The complaint alleges that defendants violated the ADA by requiring medical examinations and making medical inquiries that were "neither job-related nor consistent with business necessity." Compl. ¶ 64 (citing 42 U.S.C. § 12112(c)(4)). On appeal, plaintiffs also argue that "the ADA limits medical recordkeeping by an employer to the results of job-related examinations consistent with business necessity." Appellant Br. at 49 (citing 42 U.S.C. § 12112(d)). Plaintiffs do not allege that defendants made use of information gathered in the examinations to discriminate against them on the basis of disability; indeed, neither Garcia nor Fuentes received any positive test results.

The ADA creates three categories of medical inquiries and examinations by employers: (1) those conducted prior to an offer of employment ("preemployment" inquiries and examinations); (2) those conducted "after an offer of employment has been made" but "prior to the commencement of ... employment duties" ("employment entrance examinations"); and (3) those conducted at any point thereafter. It is undisputed that the second category, employment entrance examinations, as governed by

§ 12112(d)(3), are the examinations and inquiries to which Fuentes and Garcia were subjected. Unlike examinations conducted at any other time, an employment entrance examination need *not* be concerned solely with the individual's "ability to perform job-related functions," § 12112(d)(2); nor must it be "job-related or consistent with business necessity," § 12112(d)(4). Thus, the ADA imposes no restriction on the *scope* of entrance examinations; it only guarantees the *confidentiality* of the information gathered, § 12112(d)(3)(B), and restricts the *use* to which·an employer may put the information. § 12112(d)(3)(C); *see* 42 U.S.C. § 12112(d)(1) (medical examinations and inquiries must be consistent with the general prohibition in § 12112(a) against discrimination on the basis of disability); 29 C.F.R. § 1630.14(b)(3) (if the results of the examination exclude an individual on the basis of disability, the exclusionary criteria themselves must be job-related and consistent with business necessity). Because the ADA does not limit the scope of such examinations to matters that are "job-related and consistent with business necessity," dismissal of the ADA claims was proper.

Plaintiffs' new argument on appeal that the ADA limits medical recordkeeping to "the results of job-related examinations consistent with business necessity" also lacks merit. Section 12112(d)(3)(B) sets forth the conditions under which information obtained during the entrance examination must be kept but clearly does not purport to restrict the records that may be kept to matters that are "job-related and consistent with business necessity."[22] Thus plaintiffs' ADA claims also fail in this respect.

The only possible ADA claim is directed at the defendants' alleged failure to maintain plaintiffs' medical records in the

---

21. The relevant portions of Title II of the ADA, which applies to public entities, were effective on January 26, 1992, 18 months after enactment. Title I of the ADA has an effective date of July 26, 1992, 24 months after enactment. §§ 108, 205, Pub.L. No. 101–336.

22. Section 12112(d)(3)(B) provides that

information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in

separate medical files and is treated as a confidential medical record, except that—

(i) supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;

(ii) first aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and

(iii) government officials investigating compliance with this chapter shall be provided relevant information[.]

manner required by § 12112(d)(3)(B). The allegations in plaintiffs' complaint do not explicitly set forth such a violation but incorporate by reference the factual allegation that the defendants "[f]ail[ed] to provide safeguards to prevent the dissemination to third parties of sensitive medical information regarding the plaintiffs." On appeal the plaintiffs argue only that the defendants have "failed to describe the procedures by which a third party might gain access to the records, and the enforcement of any rules, policies, regulations or procedures to prevent third parties from gaining access to the records." To the extent that one can construe the complaint to allege that the defendants are in violation of § 12112(d)(3)(B), the bare allegation that defendants have not provided, or adequately described, safeguards fails to state a violation of the ADA requirements as set forth in § 12112(d)(3)(B) or as implemented in Department orders. *See* DOE Order 440.1 (Sep. 30, 1995); DOE Order 5480.8A (June 6, 1992); DOE Order 5480.8 (May 22, 1981). Accordingly, dismissal of the ADA claims was proper.

## VI. *Plaintiffs' Claims Are Not Moot*

The Secretary contends that the claims against him in his official capacity for injunctive and declaratory relief are moot because (1) the only testing that the Department ever required was syphilis testing, and (2) the DOE order that required syphilis testing was cancelled on June 22, 1992, and replaced by a different order that requires "[u]rinalysis and serology" only "when indicated." *Compare* DOE Order 5480.8 (May 22, 1981), *with* DOE Order 5480.8A (June 26, 1992). Although the state defendants do not raise the issue, a similar argument can be made on their behalf: Lawrence discontinued syphilis testing in April 1993, pregnancy testing in December 1994, and sickle cell trait testing in June 1995.

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (quoting *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969)). "Mere voluntary cessation of allegedly illegal conduct does not moot a case; it if did, the courts would be compelled to leave [t]he defendant ... free to return to his old ways." *United States v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968) (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)). Nevertheless, part or all of a case may become moot if (1) "subsequent events [have] made it absolutely clear that the allegedly wrongful behavior [cannot] reasonably be expected to recur," *Concentrated Phosphate,* 393 U.S. at 203, 89 S.Ct. at 364, *and* (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Lindquist v. Idaho State Bd. of Corrections,* 776 F.2d 851, 854 (9th Cir.1985) (quoting *Davis,* 440 U.S. at 631, 99 S.Ct. at 1383). "The burden of demonstrating mootness 'is a heavy one.'" *Davis,* 440 U.S. at 631, 99 S.Ct. at 1383 (quoting *W.T. Grant,* 345 U.S. at 632–33, 73 S.Ct. at 897).

Defendants have not carried their heavy burden of establishing *either* that their alleged behavior cannot be reasonably expected to recur, *or* that interim events have eradicated the effects of the alleged violation. First, they do not contend that the Department will never again require or permit, or that Lawrence will never again conduct, the tests at issue. They assert only that syphilis testing was discontinued because of its limited usefulness in screening healthy populations, and that sickle cell trait testing was discontinued as redundant of testing that most African–Americans now receive at birth. Moreover, in the case of pregnancy testing, they do not even argue that such testing is no longer medically useful; rather, they have simply made it optional. Defendants have neither asserted nor demonstrated that they will never resume mandatory testing for intimate medical conditions; nor have they offered any reason why they might not return in the future to their original views on the utility of mandatory testing. In contrast, plaintiffs have introduced evidence, in the form of correspondence between Lawrence and the department, that the syphilis tests were discontinued merely for reasons of "cost-effectiveness." *See Concentrated Phosphate,* 393 U.S. at 203, 89 S.Ct. at 364 (hold-

ing that mere statement that it would be "uneconomical" for defendants to continue their allegedly wrongful conduct "cannot suffice to satisfy the heavy burden" of establishing mootness).

Second, defendants also have not asserted that any "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Lindquist,* 776 F.2d at 854. Indeed, it is undisputed that the Department requires Lawrence to retain plaintiffs' test results and that Lawrence does in fact do so. *See* DOE Order 440.1, dated September 30, 1995 ("Employee medical records shall be adequately protected and stored permanently."). Even if the continued storage, against plaintiffs' wishes, of intimate medical information that was allegedly taken from them by unconstitutional means does not *itself* constitute a violation of law, it is clearly an ongoing "effect" of the allegedly unconstitutional and discriminatory testing, and expungement of the test results would be an appropriate remedy for the alleged violation. *Cf. Fendler v. United States Parole Comm'n,* 774 F.2d 975, 979 (9th Cir.1985) ("Federal courts have the equitable power 'to order the expungement of Government records where necessary to vindicate rights secured by the Constitution or by statute.'") (quoting *Chastain v. Kelley,* 510 F.2d 1232, 1235 (D.C.Cir.1975)); *Maurer v. Pitchess,* 691 F.2d 434, 437 (9th Cir.1982).[23] Accordingly, plaintiffs' claims for injunctive and declaratory relief are not moot.

VII. *Irreparable Injury*

Finally, the Secretary contends that plaintiffs cannot seek injunctive relief because they have not alleged irreparable injury. To obtain injunctive relief, " '[a] reasonable showing' of a 'sufficient likelihood' that plaintiff will be injured again is necessary." *Kruse v. State of Hawai'i,* 68 F.3d 331, 335 (9th Cir.1995) (internal quotation marks omitted); *see City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675 (1983). "The likelihood of the injury recurring must be calculable and if there is *no* basis for predicting that any

future repetition would affect the present plaintiffs, there is no case or controversy." *Sample v. Johnson,* 771 F.2d 1335, 1340 (9th Cir.1985). In this case, plaintiffs seek not only to enjoin future illegal testing, but also to require defendants, *inter alia,* to notify all employees who may have been tested illegally; to destroy the results of such illegal testing upon employee request; to describe any use to which the information was put, and any disclosures of the information that were made; and to submit Lawrence's medical department to "independent oversight and monitoring."

At the very least, the retention of undisputedly intimate medical information obtained in an unconstitutional and discriminatory manner would constitute a continuing "irreparable injury" for purposes of equitable relief. Moreover, the Department orders still require Lawrence to conduct preplacement examinations. DOE Order 440.1 (Sep. 30, 1995). Thus, there seems to be at least a reasonable possibility that Lawrence would again conduct undisclosed medical testing of its employees for intimate medical conditions. For these reasons, a request for injunctive relief is proper.

## CONCLUSION

Because material and disputed issues of fact exist with respect to whether reasonable persons in plaintiffs' position would have had reason to know that the tests were being performed, and because the tests were a separate and more invasive intrusion into their privacy than the aspects of the examination to which they did consent, the district court erred in granting summary judgment on statute of limitations grounds with respect to the Title VII claims and the federal and state constitutional privacy claims. The district court also erred in dismissing the federal and state constitutional privacy claims and the Title VII claims on the merits. The district court's dismissal of the ADA claims was proper. None of the Secretary's arguments with respect to the claims brought against him in his official capacity has merit.

---

**23.** *Fendler* and *Maurer* both concern the equitable power of federal courts to expunge criminal convictions in particular. While the exercise of that "narrow power" is "appropriately used only

in extreme circumstances," *United States v. Smith,* 940 F.2d 395, 396 (9th Cir.1991), destruction of plaintiffs' medical records is a relatively moderate measure.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.