204 P.3d 1063

HAVASUPAI TRIBE OF the HAVASUPAI RESERVATION, a federally recognized Indian tribe, Plaintiff/Appellant,

v.

ARIZONA BOARD OF REGENTS and Therese Ann Markow, Defendants/Appellees.

Carletta Tilousi, Ruth Havatone, Fydel Jones, Lenora Jones, Orlando Manakaja, Rosemarie Manakaja, Sheila Manakaja, Aral Kaska Putesoy, Caroline Putesoy, Desiree Putesoy, Ingrid Putesoy, Mark Putesoy, Sherry Dee Putesoy, Carol Ann Rogers, Gloria Siyuja, Kathleen Siyuja, Rex Tilousi, Nettie Tilousi, Rosella Tilousi, Muriel Uqualla, Rena Uqualla, Claudia Watahomigie, Leota Watahomigie, Patricia Watahomigie, Violet Watahomigie, Arlene Wescogame, Carrie Goldbaum, Eljean Hanna, Grace Hanna, Matthew Putesoy, Edmond Tilousi, Dianna Uqualla, Flora Wright, Natalie Wright, Daisy Jones, Haven J.H. Manakaja, Jeffrey Manakaja, Roland Manakaja, Gretchen Putesoy, Bemus Uqualla, Debbie D. Uqualla, Floranda Uqualla, Lucinda Watahomigie, Dennie Wescogame, Germaine Paya Watahomigie, Vivian Wecogame, Plaintiffs/Appellants,

v.

Arizona Board of Regents; Therese Ann Markow; John Martin and Daniel Benyshek, Defendants/Appellees.

Nos. 1 CA–CV 07–0454, 1 CA–CV 07–0801.

Court of Appeals of Arizona, Division 1, Department D.

Nov. 28, 2008.

Review Denied April 20, 2009.

Rosette & Associates, PC By Robert A. Rosette, Brendan L. Ludwick, Chandler, and Fredricks & Peebles, LLP By Conly J. Schulte, Joseph V. Messineo, Omaha, NE, Attorneys for Plaintiff/Appellant Havasupai Tribe.

Rusing & Lopez, P.L.L.C. By Michael J. Rusing, Todd Hardy, Tucson, Attorneys for Defendant/Appellee Theresa Ann Markow.

Terry Goddard, Attorney General By Daniel P. Schaack, Assistant Attorney General, Catherine O'Grady, Special Assistant Attorney General, Phoenix, Attorneys for Defendant/Appellee Arizona Board of Regents.

Law Offices of Charles M. Brewer Ltd. By David L. Abney, Phoenix, Attorneys for Amicus Curiae The Arizona Trial Lawyers' Association.

Law Offices of Albert Flores By Albert M. Flores, Phoenix, and Holland & Knight LLP By Stephen F. Hanlon, Frank Lawrence, George E. Schulz, Jr., LaKeytria W. Felder, Washington, D.C., Attorneys for Individual Plaintiffs/Appellants.

Mariscal, Weeks, McIntyre & Friedlander By Gary L. Birnbaum, Scot L. Claus, Phoenix, Attorneys for Defendants/Appellees John Martin and Daniel Benyshek.

## OPINION

JOHNSEN, Judge.

¶ 1 Plaintiffs in these consolidated cases[1] brought claims against the Arizona Board of Regents ("ABOR") and others arising out of the alleged misuse of blood samples taken from members of the Havasupai Tribe in the early 1990s. In each case, the superior court entered summary judgment against the plaintiffs because it concluded they failed to comply with Arizona's notice-of-claim statute, Arizona Revised Statutes ("A.R.S.") section 12–821.01 (2003). Asked to apply the statute's requirement that a claimant provide "facts supporting" the stated settlement demand, we reverse the judgments for the reasons explained below.

## FACTUAL AND PROCEDURAL HISTORY

### A. The Havasupai Project.

¶ 2 Members of the Havasupai Tribe ("Tribe") live in Supai Village in the bottom of the Grand Canyon.[2] An Arizona State University ("ASU") anthropology professor named John Martin began studying the Tribe in 1963. Over the next few decades, Martin developed a strong relationship with the Tribe, working with its members on education issues, community action and development programs, and social and environmental studies. In 1989, a member of the Tribe asked Martin to look into a perceived "epidemic" of diabetes among tribal members. Martin suspected tribal members' diabetes was related to genetics and diet. He approached ASU genetics professor Therese Markow, who agreed to work with Martin on what Martin described as a "diabetes-centered project." Although Markow expressed a desire to broaden the research to include schizophrenia, one of her areas of academic interest, Martin told her that the Havasupai likely would not be interested in a study

---

1. These cases were consolidated in the superior court but appellants took separate appeals from the orders of dismissal. Because the cases are based on the same facts and raise many similar legal issues, we exercise our discretion to consolidate them for appellate disposition. *See* ARCAP 8(b).

2. We view the facts and the inferences to be drawn from them in the light most favorable to the appellants as the parties against whom summary judgments were entered. *Prince v. City of Apache Junction*, 185 Ariz. 43, 45, 912 P.2d 47, 49 (App.1996). For the most part, the facts we recite are taken from the Hart Report, *infra* ¶ 8.

exploring other issues, but he did not foreclose the possibility. Nevertheless, almost immediately, Markow prepared an (ultimately successful) grant application to study schizophrenia among tribal members.

¶ 3 The ASU researchers created a script for presenting the blood-draw proposal to the Havasupai and also prepared informed-consent documents. Between 1990 and 1992, blood samples were taken from more than 200 Havasupai. In exchange for the Tribe's participation in the project, ASU allowed 15 tribal members to attend some summer courses free of charge. The blood draws continued through 1992, but researchers soon concluded diabetes was growing too quickly among tribal members to be related to genetics. Markow reported in a paper published in November 1991 that there was too little variation among tribe members' genetics to conclude the incidence of the disease among them was genetics-related.

¶ 4 Although the project ended for the purposes allegedly consented to by the Havasupai, researchers at ASU and elsewhere, including the University of Arizona, continued to perform research and publish articles based on data from tribal members' blood samples. Among the publications were at least four doctoral dissertations and various academic papers, some of which concerned evolutionary genetics, rather than medical genetics. Some of the papers generated from the blood samples dealt with schizophrenia, inbreeding and theories about ancient human population migrations from Asia to North America. The latter body of work is contrary to the Havasupai belief that, as a people, they originated in the Grand Canyon.

### B. Questions of Informed Consent Are Raised.

¶ 5 Martin, who had thought the diabetes project had ended after early studies failed to identify a genetic link to the disease among tribal members, learned in 2002 that non-diabetes genetic research had continued on the Havasupai samples. After he was told in 2003 that an ASU graduate student was nearing completion of a dissertation based on additional Havasupai genetics research, Martin contacted several ASU officials, including a member of the ASU General Counsel's Office, to complain that tribal members' blood samples were being used without consent. In March 2003, a tribal member named Carletta Tilousi attended the dissertation defense. Tilousi asked the graduate student about the procedures used to obtain the blood donors' permission for his research, but received a response that was equivocal at best.

¶ 6 A few days later, Martin disclosed to the Havasupai Tribal Council that ASU may have "mishandled" blood samples taken as part of the diabetes research project. The Tribe asked ASU for further information regarding the use of the blood samples, and on April 9, 2003, ASU told the Tribe it would undertake a prompt and thorough investigation. In the absence of further information from ASU, however, on May 9, 2003, the Tribe approved a "banishment order" that stated in relevant part:

> The Havasupai Tribe has recently been informed by reliable sources that Havasupai blood collected by A.S.U. has been distributed to others for research, and that research may have been conducted on Havasupai blood, by [ ASU] and by others, for purposes unrelated to diabetes or any other medical disorder, all in violation of the consent given by Havasupai members.

> \* \* \*

> [ASU], its Professors and employees are, from this date forward banished from the Havasupai Reservation.

¶ 7 Three days after it issued the banishment order, the Tribe informed ASU that it intended to hold a press conference to publicize the matter. ASU asked the Tribe not to go forward with the press conference and offered to hire "an external authority" jointly selected with the tribal council to investigate what happened with respect to the blood samples and the subsequent research. The Tribe accepted the offer and with ASU signed a Joint Confidentiality and Cooperative Investigation Agreement, the expressed purpose of which was to discover "the circumstances surrounding the collection of blood samples and other research data from members of the Havasupai Tribe and any

and all subsequent uses of the samples or their derivatives and other research data for research or other purposes."

## C. The Hart Report and the Settlement Meetings.

¶ 8 ABOR retained Phoenix attorney Stephen Hart to perform the promised independent investigation. Hart reported to the Tribe and various ASU and ABOR representatives on the status of his investigation during a meeting on September 5, 2003. On October 24, 2003, members of the Tribe and its counsel met with counsel for ABOR and other ABOR representatives to discuss settling the Tribe's claims relating to the project. No settlement was reached at that time, and on December 23, 2003, Hart issued a final report describing his investigation and listing his findings. The Hart Report was 152 pages long, not counting 319 attached exhibits that together came to thousands of pages. A week later, at the request of ASU general counsel Paul Ward, counsel for both sides met again to discuss resolving the case, but no settlement was reached.

## D. The Tribe's Notices of Claim.

¶ 9 Plaintiff in the first of these two consolidated cases is the Havasupai Tribe, which filed three separate notice-of-claim letters, dated September 8, 2003, March 5, 2004 and March 31, 2004, respectively.

¶ 10 The Tribe's first notice of claim was dated three days after Hart met with the Tribe and others to initially report on the status of his investigation. The September 8 letter was addressed to Markow, Attorney General Terry Goddard and ASU President Michael Crow. The Tribe also served copies of the letter on ASU's general counsel and Assistant Attorney General Richard Albrecht, both of whom had represented themselves to the Tribe as counsel for ASU and ABOR. The Tribe stated the notice was on its own behalf and as *parens patriae* for all members of the Tribe involved in the diabetes project.[3]

¶ 11 In the September 8 letter, counsel for the Tribe asserted that "ASU conducted genetics experiments on the Havasupai blood samples or derivatives . . . for purposes unrelated to diabetes" without tribal members' consent. Without consent, the Tribe further asserted, ASU "published papers unrelated to diabetes but which disclosed private genetic data and other private information derived from the Havasupai blood samples." Further, the Tribe alleged, ASU distributed tribal members' blood samples to third-party institutions without consent to do so. These third-party institutions conducted their own genetics research and published the results, all without consent, the Tribe alleged. "ASU's actions have invaded the personal privacy of Havasupai tribal members and the cultural and religious privacy of the Havasupai Tribe," the letter asserted. Under a section labeled "Amount for which the claim can be settled," the Tribe's counsel wrote:

> The Havasupai Tribe does not know all of the facts about what ASU has done with the Havasupai blood samples since ASU removed them from Supai Village. The Tribe has requested this information from ASU. ASU has not disclosed all such facts. Therefore, this Notice is based on the best available information. At this time, however, the Tribe is not sufficiently informed to set an amount for which the Tribe's and member-donors' claims can be settled. After ASU provides sufficient facts about what ASU and others have done with Havasupai blood samples, the Tribe will amend or supplement this Notice and provide a settlement figure.
>
> Please contact me if you wish to discuss this Notice.

¶ 12 In its second notice-of-claim letter, dated March 5, 2004, again addressed to Markow, Goddard and Crow, the Tribe's counsel identified a specific amount for which it would settle its claims:

> ASU has still not disclosed all of the relevant facts, including the whereabouts of all of the Havasupai blood and genetic material taken from tribal members and all

---

3. Under the *"parens patriae"* doctrine, a government may prosecute a lawsuit on behalf of a citizen, particularly a citizen unable to bring a suit on her own. Black's Law Dictionary 1144 (8th ed. 2004).

of the uses to which such blood and genetic materials have been put. Nevertheless, the Tribe, in compliance with A.R.S. § 12–821.01(A) hereby notifies ASU that it is willing to settle all claims for the sum certain of $50 million. The Tribe believes that this amount would be adequate to compensate the Tribe and those individual members for whom the Tribe is acting in *parens patriae* for the litany of injuries inflicted on them by ASU, and to punish ASU for its wrongful conduct.

Please contact me if you wish to discuss this supplement further.

¶ 13 In a third letter stamped received on March 31, 2004, addressed only to Goddard, the Tribe reiterated its willingness to settle for $50 million and added additional details about its claim:

The acts, omissions and conduct of the University of Arizona and its professors constitutes [sic] breach of fiduciary duty, lack of informed consent, fraud, misrepresentation, fraudulent concealment, intentional infliction of emotional distress, negligent infliction of emotional distress, conversion, violations of civil rights, negligence, gross negligence and negligence per se. These actions have violated the Havasupai Tribe's and tribal members' cultural, religious, and legal rights and have caused the Havasupai Tribe and its members severe emotional distress. The Havasupai Tribe and its members intend to pursue all relevant state and federal claims in this matter. The Havasupai Tribe will seek compensatory, general, specific, punitive and other relevant damages as well as attorney's fees under the applicable causes of action.

### E. The Tilousi Plaintiffs' Notices of Claim.

¶ 14 Plaintiffs in the second case we address are Tilousi and 51 other tribal members. Some or all of those plaintiffs filed four notices of claim with ABOR and others. Tilousi's first notice, dated August 14, 2003, was a letter from counsel addressed to Goddard, Martin, Markow and Daniel Benyshek, another ASU researcher. The letter stated in pertinent part:

We represent twenty-nine (29) members of the Havasupai Tribe. . . .

\* \* \*

. . . Based on information and belief, ASU has misused these blood samples for additional studies unrelated to the diabetes study without our Clients' consent *causing our Clients severe harm and extreme distress.*

\* \* \*

. . . ASU cannot or will not provide us with a full accounting of the handling, transfer, or use of the Havasupai blood samples since obtaining such samples in the early 1990's. *ASU has simply left our Clients to worry about the possible uses and locations of their blood samples, the violation of their religious values and beliefs, whether these samples have been lost, and whether they will continue to be used for additional unauthorized purposes. Many of our Clients now fear going to the health clinic, seeking medical attention, or providing blood samples for medical diagnosis or treatment.*

\* \* \*

. . . ASU has refused to provide us with any substantive information regarding this matter[,] nor has ASU released the findings of its so called "independent" investigation to the public or others. In the event that additional facts come to light, we reserve the right to bring additional claims based upon those facts.

Our Clients believe that ASU has misused their blood samples for unauthorized purposes causing them severe harm, extreme distress, and emotional trauma. . . .

\* \* \*

Our Clients would prefer to allow a jury to determine how much ASU and other defendants should pay to compensate our Clients for their injuries. However, in conformance with the State statute, our Clients are required to state a settlement amount. Consequently, please be advised that our Clients would settle their claims

at this early juncture for $45,000[ ] per client.

(Emphasis added.)

¶ 15 In a second letter dated November 6, 2003, addressed only to ASU's general counsel, Tilousi's counsel stated that they had been retained by 15 "additional members of the Havasupai Tribe who believe their blood samples were misused by ASU." The letter continued:

As you know, on October 24, 2003, ASU confirmed to the Havasupai Tribal Council that the Havasupai blood samples were improperly collected and mishandled by ASU officials, and used for unauthorized purposes including various studies to determine if ancestors of modern-day Havasupai people traveled across the Bering Strait land bridge from Asia eons ago. Clearly, those unauthorized uses of the blood samples are totally unrelated to the diabetes study originally promised by ASU officials....

Our clients believe that ASU has misused their blood samples for unauthorized purposes causing them harm, extreme distress, and emotional trauma. The conversion and improper use of these blood samples by ASU officials violates our client[s'] privacy as well as their cultural, religious, and legal rights....

In closing, plaintiffs' counsel also noted, "Please feel free to call me . . . so that we may discuss this matter."

¶ 16 In a third notice of claim letter, this one addressed to ASU's general counsel and to Assistant Attorney General Albrecht, dated December 29, 2003, plaintiffs' counsel stated they had been retained by two additional members of the Tribe who had "the same or similar claims" as the other members. Again, plaintiffs' counsel stated, "Please feel free to call me if [you] have any questions or need any additional information."

¶ 17 Finally, on March 4, 2004, plaintiffs' counsel sent a fourth letter addressed to Goddard, ABOR, the Chair of the University of Arizona Committee on Ethics & Commitment, the general counsel of the University

of Arizona, Markow and three other researchers. This letter explained that counsel then represented 52 listed members of the Tribe. Counsel stated:

In January 2004, Attorney Stephen Hart . . . issued a Final Report . . . on the acquisition, use, transfer, loss, and destruction of hundreds of blood samples, data, and related information including hand prints and genealogy . . . We believe the Final Report clearly shows that not only did ASU commit numerous violations of law, but also [the University of Arizona ("UA")] and its professors engaged in extensive misconduct which has caused serious harm to our clients.

* * *

. . . UA and its professors . . . have inflicted intentional and negligent infliction of emotional distress on our clients.... These actions have violated our clients' cultural, religious, and legal rights and have caused them severe emotional distress.

This final letter closed with a new lump-sum demand: "[P]lease be advised that our clients would settle their claims at this early juncture for ten million dollars, $10,000,000."

### F. Superior Court Proceedings.

#### 1. The Tribe case.

¶ 18 On March 12, 2004, the Tribe filed a complaint alleging state and federal claims against ABOR and Markow.[4] Defendants removed the complaint to federal court, which dismissed the federal-law and *parens patriae* claims but granted the Tribe leave to amend to allege claims for breach of fiduciary duty, fraud, negligence and trespass.

¶ 19 After the case was remanded to state court and an amended complaint filed, ABOR moved for summary judgment, arguing that the amended complaint should be dismissed because the Tribe had failed to comply with A.R.S. § 12–821.01. Joined by Markow, ABOR contended that the September 8, 2003 notice did not identify a specific amount for which the claim could be settled and that the

---

4. Other named defendants since have been dismissed.

**222**

subsequent notices of claim were untimely. It also argued that all three notices were improperly served.

¶ 20 After briefing was complete on ABOR's motion but before the court issued its ruling, our supreme court decided *Deer Valley Unified School District No. 97 v. Houser*, 214 Ariz. 293, 152 P.3d 490 (2007). ABOR and Markow subsequently filed a supplemental memorandum in which they argued that, pursuant to *Deer Valley*, the Tribe's notices of claim were defective because they failed to include a specific amount for which the claim could be settled and facts supporting that amount.

¶ 21 The superior court granted defendants' motions, concluding that even if the three notices of claim were timely, they failed because even read together, they did not contain "facts supporting the amount sought in settlement of [their] claims." The court added:

> ... There is no explanation whatsoever [in] the letters regarding how the Tribe came up with its $50,000,000 demand such as would allow [Defendants] to evaluate the demand's reasonableness or make a determination as to why $50,000,000 does not constitute a quick, unrealistic exaggerated demand.

### 2. The Tilousi case.

¶ 22 Tilousi and 51 other individuals filed a complaint on February 26, 2004, alleging state and federal claims against ABOR and several individual defendants, including Markow, Martin and Benyshek. After the defendants removed the case to federal court, the federal-law claims and several other claims were dismissed; however, claims alleging negligent and intentional infliction of emotional distress and negligence survived.

¶ 23 After remand to the superior court, two sets of motions ensued. First, Markow, joined by the other defendants, moved for summary judgment on the basis that certain of the plaintiffs failed to file a notice of claim before commencing suit. Martin and Benyshek filed a similar motion arguing that

certain plaintiffs had not served them with a notice of claim. The court granted both motions.[5]

¶ 24 The second set of motions presented the primary issue in this appeal. Citing *Deer Valley*, defendants argued on summary judgment that the notices of claim failed to include a specific amount for which the claim could be settled and facts supporting that amount.

¶ 25 As in the case brought by the Tribe, the superior court found that even if the four notices of claim were timely, they failed because together they lacked "facts supporting the amount sought in settlement of [their] claims." In granting summary judgment, the court explained:

> The Court is of the opinion that the [notice of claim] does not satisfy the statutory requirement that Plaintiffs provide the facts supporting the specific amount for which the claim can be settled. In that regard, while the initial letter does state that ASU has left the Plaintiffs to worry about certain things, the letter does not state that any given Plaintiff is worrying or, if certain ones are, which ones and what worries they have.
>
> Similarly while the letter indicates that "many of our Clients now fear going to the health clinic, seeking medical attention, or providing blood samples for medical diagnosis or treatment[,]" the letters do not indicate which Plaintiffs are experiencing fear and/or which of the referenced fears they are experiencing.
>
> Finally, while Plaintiffs explain in the March 4, 2004 letter why the [Hart] Report establishes the existence of the alleged violations and misconduct, there is nothing in that letter suggesting that Plaintiffs have suffered any additional fear, worry, harm or emotional distress. Yet, Plaintiffs['] settlement demand increases from $45,000 per Plaintiff to over $190,000 per Plaintiff.

¶ 26 Plaintiffs in both cases appeal the dismissal of their claims. We have jurisdic-

---

**5.** The court concluded that Martin and Benyshek had not waived and were not estopped from asserting a notice-of-claim defense because they

had asserted it in their answer. In this appeal, the Tilousi Plaintiffs do not contest those findings.

tion pursuant to A.R.S. section 12–2101(B) (2003).

## DISCUSSION

### A. Standard of Review.

¶ 27 Summary judgment may be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Ariz. R. Civ. P. 56(c)(1). We review a summary judgment *de novo* to determine whether any genuine issues of material fact exist and whether the court properly applied the law. *Eller Media Co. v. City of Tucson*, 198 Ariz. 127, 130, ¶ 4, 7 P.3d 136, 139 (App.2000).

### B. Analysis.

#### 1. Legal principles.

¶ 28 Our goal in construing statutes is to give effect to legislative intent. *Zamora v. Reinstein*, 185 Ariz. 272, 275, 915 P.2d 1227, 1230 (1996). The plain language of a statute is the strongest indicator of legislative intent, and when that language is clear, "it is determinative of the statute's construction." *Deer Valley*, 214 Ariz. at 296, ¶ 8, 152 P.3d at 493 (quoting *Janson v. Christensen*, 167 Ariz. 470, 471, 808 P.2d 1222, 1223 (1991)). "Each word, phrase, clause, and sentence [of a statute] must be given meaning so that no part will be void, inert, redundant, or trivial." *Id.* (alteration in original) (emphasis omitted) (quoting *Williams v. Thude*, 188 Ariz. 257, 259, 934 P.2d 1349, 1351 (1997)). If a statute is not clear, we may infer its meaning from its purpose. *Martineau v. Maricopa County*, 207 Ariz. 332, 334, ¶ 9, 86 P.3d 912, 914 (App.2004). Finally, we construe a statute as a whole in order to best give effect to the entire statutory scheme. *See Parrot v. DaimlerChrysler Corp.*, 212 Ariz. 255, 258, ¶ 18, 130 P.3d 530, 533 (2006).

¶ 29 Section 12–821.01(A) provides:

Persons who have claims against a public entity or a public employee shall file claims with the person or persons authorized to accept service for the public entity or public employee as set forth in the Arizona rules of civil procedure within one hundred eighty days after the cause of action accrues. The claim shall contain facts sufficient to permit the public entity or public employee to understand the basis upon which liability is claimed. The claim shall also contain a specific amount for which the claim can be settled and the facts supporting that amount. Any claim which is not filed within one hundred eighty days after the cause of action accrues is barred and no action may be maintained thereon.

¶ 30 The purpose of the statute is to provide the government entity with an opportunity to investigate the claim, assess its potential liability, reach a settlement prior to litigation, budget and plan. *Deer Valley*, 214 Ariz. at 295, ¶ 6, 152 P.3d at 492. If a notice of claim is not properly served, the claim is barred. *See Falcon v. Maricopa County*, 213 Ariz. 525, 527, ¶ 10, 144 P.3d 1254, 1256 (2006) ("Actual notice and substantial compliance do not excuse failure to comply with the statutory requirements of A.R.S. § 12–821.01(A).").

#### 2. Waiver and estoppel.

¶ 31 We first address the Tribe's argument that ABOR and Markow waived their rights under A.R.S. § 12–821.01 by failing to raise the statute as a defense in a prior motion to dismiss. As noted, in a prior omnibus motion, other defendants, not those now remaining in the case, moved to dismiss on the ground they had not been served with a notice of claim. We agree with the superior court that, having raised section 12–821.01 in their answer, ABOR and Markow did not waive the statute by failing to move to dismiss pursuant to the statute at the same time their co-defendants raised the statute in an earlier motion to dismiss.

¶ 32 The Tribe also argues ABOR and Markow waived the argument that the notice lacked facts to support the demand because they failed to raise the defense until three years after the initial notice of claim and long after engaging in settlement meetings that presumably were based on information set forth in the notice of claim. *See Pritchard v. Arizona*, 163 Ariz. 427, 432, 788 P.2d 1178, 1183 (1990). More generally, the Tribe also argues ABOR and Markow are estopped

from raising a "facts supporting" defense under the notice-of-claim statute because they took several actions inconsistent with that defense, including commissioning the Hart investigation, processing and considering the Tribe's claim and participating in settlement meetings with the Tribe. *See Young v. City of Scottsdale*, 193 Ariz. 110, 114, ¶ 15, 970 P.2d 942, 946 (App.1998) (city waived argument that notice of claim was not properly served by processing the claim and failing to object to service of process) *disapproved on other grounds by Deer Valley*, 214 Ariz. at 297, ¶ 12, 152 P.3d at 494.

¶ 33 Waiver is the voluntary intentional relinquishment of a known right or conduct that would warrant an inference of such intentional relinquishment. *Am. Cont'l Life Ins. Co. v. Ranier Constr. Co.*, 125 Ariz. 53, 55, 607 P.2d 372, 374 (1980); *see Jones v. Cochise County*, 218 Ariz. 372, 379–81, ¶¶ 22–29, 187 P.3d 97, 104–06 (App.2908) (county's waiver of right to assert notice-of-claim defense was independent reason to reverse summary judgment against plaintiff). Estoppel requires proof that the defendant acted inconsistently with the defense and that the plaintiff relied on the defendant's actions and suffered prejudice because of that reliance. *John C. Lincoln Hosp. & Health Corp. v. Maricopa County*, 208 Ariz. 532, 537–38, ¶¶ 10–13, 96 P.3d 530, 535–36 (App. 2004).

¶ 34 Defendants argue the facts fall short of establishing waiver or estoppel. Our review of the record reveals that the Tribe did not raise these specific waiver or estoppel arguments in opposing the motion for summary judgment in the superior court. In the absence of a full record and the benefit of the superior court's consideration of the evidence, we decline to address whether defendants waived their rights under the statute or are estopped from asserting them by their promises to investigate the matter, their commissioning of the Hart investigation, their engaging in the settlement meetings or like acts. *See CDT, Inc. v. Addison, Roberts & Ludwig, C.P.A., P.C.*, 198 Ariz. 173, 178,

¶ 19, 7 P.3d 979, 984 (App.2000) (declining to consider issues not presented to the superior court).

### 3. Facts supporting the specific amount demanded.

#### a. The Tribe's notices of claim.

¶ 35 The Tribe's March 5 letter stated a specific amount—$50 million—demanded in settlement. *See Deer Valley*, 214 Ariz. at 296, ¶ 9, 152 P.3d at 493 (statute "unmistakably instructs claimants to include a particular and certain amount of money that, if agreed to by the governmental entity, will settle the claim"). As noted, however, the superior court dismissed the Tribe's claims because it found the Tribe's notice failed to set forth "the facts supporting" its settlement demand. *See* A.R.S. § 12–821.01(A). In *dicta* in *Deer Valley*, the supreme court noted the "facts supporting" component of the statute and suggested it is an independent element that must be satisfied under the statute. 214 Ariz. at 297 n. 3, ¶ 11, 152 P.3d at 494 n. 3. Because the notice of claim at issue in that case failed to set forth a sum-certain settlement demand, however, the court did not reach the issue of whether the notice stated "the facts supporting" the settlement demand. *Id.*

¶ 36 As did the superior court, we will consider the Tribe's notice-of-claim letters together to determine whether they satisfied the "facts supporting" requirement of the statute. In our review, however, we will not consider the last of the three letters, apparently sent on March 31, 2004, because that notice was untimely as a matter of law.[6]

¶ 37 A notice of claim is untimely if not filed within 180 days "after the cause of action accrues." A.R.S. § 12–821.01(A). For purposes of the statute, "a cause of action accrues when the damaged party realizes he or she has been damaged and knows or reasonably should know the cause, source, act, event, instrumentality or condition which caused or contributed to the damage." A.R.S. § 12–821.01(B). The superior court

---

6. The letter is undated but bears the notation, "VIA PERSONAL SERVICE." A copy of the letter that appears in the record is stamped as

having been received by the Attorney General's Office on March 31, 2004. For that reason, we infer it was filed on that date.

did not reach this issue, but on appeal, the Tribe asserts that its claims did not accrue until after September 5, 2003, the date of its first meeting with Hart. For purposes of our review, we will assume the Tribe's claims accrued at least as of September 8, 2003, the date of its first notice-of-claim letter.[7] Assuming for purposes of argument that the Tribe's claim against ABOR and Markow accrued no earlier than that date, the Tribe's September 8 and March 5 letters may be read together to constitute a timely notice of claim. But we will not consider the March 31 letter, which was filed more than 180 days after September 8.[8]

¶ 38 We look, then, to the September 8 and March 5 notices to determine whether, taken together, they satisfy the requirement of section 12–821.01 to provide "the facts supporting" the settlement demand. Read together, the Tribe's two letters state that without consent, ASU conducted genetic research using tribal members' blood samples, published papers that disclosed tribal members' private genetic data and other private information derived from the blood samples, and transferred blood samples to third parties without consent. In a summary section, the September 8 letter asserted that ASU breached an agreement with the Tribe, took blood without informed consent, breached its duties to the Tribe and "invaded the personal privacy of Havasupai tribal members and the cultural and religious privacy of the Havasupai Tribe." The letter also stated the Tribe and its members "have been injured by the actions and inaction" described therein.[9]

■ ¶ 39 We reject ABOR's contention that section 12–821.01's requirement that a claim letter contain "the facts supporting" the settlement demand means that a claimant must provide all facts known by the claimant about the alleged wrong and all facts known to the claimant about the damages allegedly sustained. As the *Deer Valley* court noted, the "most reliable index of a

statute's meaning is its language." 214 Ariz. at 296, ¶ 8, 152 P.3d at 493 (quoting *Janson*, 167 Ariz. at 471, 808 P.2d at 1223). Section 12–821.01 says only that a claimant must provide "the facts supporting" the settlement demand; it does not say "all the facts supporting" the settlement demand or even "all the known facts supporting" the settlement demand. Moreover, to construe the statute in that manner would be to impose by implication a requirement that would give rise to wasteful ancillary litigation over whether, for example, a notice fairly may be read to omit a particular fact or whether a claimant knew of a fact not contained in his notice.

■ ¶ 40 Nevertheless, ABOR argues that A.R.S. § 12–821.01 requires a claimant to set forth facts "sufficient to support" its settlement demand. We cannot construe the statute in such fashion. The legislature specifically provided that a claim notice must contain "facts sufficient to permit the public entity or public employee to understand the basis upon which liability is claimed." A.R.S. § 12–821.01(A). We infer that, by contrast, because the legislature omitted a requirement that the "facts supporting" the settlement demand must be "sufficient," it did not intend that a notice would fail without "facts sufficient to support" the settlement demand. *See Vasquez v. State of Arizona*, 2008 WL 4402922, ¶ 15, 220 Ariz. 304, 206 P.3d 753 (Ariz.App.2008); *Yollin v. City of Glendale*, 219 Ariz. 24, 31–32, ¶ 23, 191 P.3d 1040, 1047–48 (App.2008); *Backus v. State of Arizona*, 534 Ariz. Adv. Rep. 26, ¶ 28, 204 P.3d 399 (App.2008) (notice is sufficient if it contains "any facts"); *Ariz. Bd. of Regents v. Ariz. Pub. Safety Ret. Fund Manager Adm'n*, 160 Ariz. 150, 157, 771 P.2d 880, 887 (App.1989) (when "the legislature has specifically used a term in certain places within a statute and excluded it in another place, courts will not read that term

---

7. In ¶¶ 58–63, *infra*, we address ABOR and Markow's arguments that the Tribe's claim accrued on an earlier date.

8. March 5, 2004 was exactly 180 days after September 8, 2003; March 31, 2004, was 206 days after September 8.

9. The Tribe repeatedly asserts that its notice-of-claim letters incorporated by reference the Hart report. We see no incorporation language in any of the Tribe's notice letters.

into the section from which it was excluded").[10]

¶ 41 The legislature's decision to omit a requirement that a claimant provide "sufficient facts supporting" his or her settlement demand is logical when one considers what a settlement demand is. The amount sought in settlement is a function of the relative strength of the claimant's liability claim and the magnitude of the damages allegedly incurred. A case "strong" on liability but "weak" on damages reasonably might support the same settlement demand as another case "weak" on liability but "strong" on damages. For this reason, depending on the claim, the "facts supporting" a demand may consist of a greater or fewer number of facts about the acts that allegedly gave rise to liability and facts describing the damages allegedly incurred. *See United Services Auto. Ass'n v. Morris*, 154 Ariz. 113, 121, 741 P.2d 246, 254 (1987) (reasonable settlement amount "involves evaluating the facts bearing on the liability and damages aspects of claimant's case, as well as the risks of going to trial"); *Backus*, 534 Ariz. Adv. Rep. at ¶ 20, 220 Ariz. at 146, 204 P.3d at 404 (" 'one size fits all' approach to compliance with the statute may be problematic").

**10.** Our colleague in dissent argues that *Backus*, on which we rely, erroneously concluded that section 12–821.01 does not mandate application of an "evaluative standard" to the requirement that a notice of claim contain "facts supporting" the settlement demand. We respectfully disagree, for the reasons stated above. The dissent observes that "support" means to "corroborate," "argue in favor of" or "substantiate" and argues that the statute's requirement that a notice contain "facts supporting" the demand must mean one or all of those. *Infra* ¶ 74. We do not disagree; our view is that the facts included in the notices at issue in this case indeed "corroborated" the various settlement demands, "argued in favor of" them and "substantiated" them. As stated in *Backus*, in the absence of a plainly stated objective requirement in the statute by which the "facts supporting" a demand are to be evaluated, we see no logic to concluding that the legislature must have intended that a claim for general damages must detail facts that describe the "incidence, nature, and severity of the damages" allegedly incurred. *Infra* ¶¶ 45–46. Finally, the dissent argues that the government could not "responsibly settle" the claims at issue without information in addition to that provided in

¶ 42 Bearing in mind our conclusion that section 12–821.01 does not require a notice to contain facts sufficient to prove a claim, we conclude the superior court erred in granting summary judgment against the Tribe because the extensive factual detail included in the Tribe's September 8 and March 5 notices of claim, read together, complied with the statute's requirement to contain "the facts supporting" its $50 million demand. The notices provided a host of details describing the defendants' alleged wrongdoing: The letters asserted that having obtained tribal members' blood samples for a limited use, namely, to study diabetes occurrences among tribal members, defendants used members' blood for genetics experiments and other uses unrelated to diabetes, all without the donors' consent. Further, although ASU allegedly represented that the research would be conducted entirely at ASU, the September 8 notice alleged that without consent, that institution distributed Havasupai blood samples to third parties, which in turn performed additional genetics experiments using tribal members' confidential blood data. Together, the Tribe asserted, ASU's acts "have invaded the personal privacy of Havasupai tribal members and the cultural and religious privacy of the Havasupai Tribe." [11]

the notices of claim. *Infra* ¶ 76. Although section 12–821.01 is intended to, *inter alia*, provide facts to enable the governmental entity to investigate its potential liability, *see Deer Valley*, 214 Ariz. at 295, ¶ 6, 152 P.3d at 492, we do not understand its purpose to be to provide the government with every single fact it might require to conclude settlement negotiations. Indeed, in this case ASU presumably relied on information contained in the Hart report and negotiated with the Tribe at more than one in-person settlement meeting.

**11.** As noted, ¶ 18 *supra*, the Tribe's invasion-of-privacy claim was dismissed in federal court prior to remand. We deal here, however, with the issue of whether the Tribe's notice of claim stated facts sufficient to support the damages said to have arisen from the claims set out in the notice of claim, not the state of the pleadings months or years later, after extensive motion practice. *See Deer Valley*, 214 Ariz. at 296, ¶ 9, 152 P.3d at 493 ("[T]he [notice of claim] statute does not require that claimants reveal the amount that they will demand at trial if litigation ensues but simply requires that claimants identify the specific amount for which they will settle and provide facts supporting that amount.").

¶ 43 Although the Tribe's notices do not describe the nature of the injury incurred, invasions of privacy relating to tissue samples such as the Tribe described in its claim notices naturally give rise to subjective personal injury, even when, as here, the samples are given voluntarily. *See Vasquez,* 2008 WL 4402922, ¶ 16, 220 Ariz. at 309–10, 206 P.3d at 758–59 (in assessing compliance with the statute, it is "appropriate to consider the cause of action in determining what facts must be provided in support of the monetary amount claimed"). Plaintiffs in *Norman–Bloodsaw v. Lawrence Berkeley Laboratory,* 135 F.3d 1260 (9th Cir.1998), were government workers who gave blood and urine samples that their employer tested without their consent for sickle cell anemia and syphilis. The Ninth Circuit had little difficulty in concluding that the district court erred in concluding that plaintiffs suffered no invasion of privacy as a result of the employer's actions: "[I]t goes without saying that the *most basic* violation possible involves the performance of unauthorized tests—that is, the non-consensual retrieval of previously unrevealed medical information that may be unknown even to plaintiffs." *Id.* at 1269. "One can think of few subject areas more personal and more likely to implicate privacy interests than of one's health or genetic make-up." *Id.*

¶ 44 In a similar case, a student who gave his school a blood sample to be tested for rubella sued when he learned the school also had tested the blood for human immunodeficiency virus. *Doe v. High–Tech Institute, Inc.,* 972 P.2d 1060, 1064 (Colo.App.1998). The court reversed the trial court's dismissal of the student's complaint because, it concluded, "a person has a privacy interest in his or her own blood sample and in the medical information that may be obtained from it." *Id.* at 1068. Accordingly, "an additional unauthorized test ... can be sufficient to state

a claim for relief for intrusion upon seclusion." *Id.*[12]

■ ¶ 45 The injury that naturally flows from the purported privacy invasions set forth in the Tribe's two notice-of-claim letters is necessarily subjective, deeply personal and may not be quantifiable except by a jury. *See Backus,* 534 Ariz. Adv. Rep. at ¶ 22, 220 Ariz. at 147, 204 P.3d at 405 (general damages "relate to things that cannot be objectively measured with certainty"). Because the purpose of the notice of claim required by A.R.S. § 12–821.01 is not to test the legal sufficiency of the claim or the damages alleged, a notice may not be deemed invalid merely because the amount demanded is not objectively quantifiable.[13]

■ ¶ 46 ABOR and Markow further argue that the Tribe's notices were insufficient because they did not specify any physical manifestations of emotional suffering or distress incurred by tribal members on account of the alleged wrongdoing. We do not agree that a notice of claim alleging general damages fails under A.R.S. § 12–821.01 if it does not describe physical manifestations of emotional distress suffered by the claimant(s). *See Backus,* 534 Ariz. Adv. Rep. at ¶ 29, 220 Ariz. at 148, 204 P.3d at 406 (statute does not require family members who alleged wrongful death claims to describe facts elaborating on their relationships with decedent).

¶ 47 It may be that what ABOR and Markow mean is that the Tribe's claims must be rejected unless tribal members can assert they suffered mental distress that manifested itself in physical symptoms. Defendants provide us with no authority for that proposition, however, and we note that pursuant to Restatement (Second) of Torts § 652(B) (1977), one's recovery for harm to an interest in privacy does not depend on proof of emotional distress. *See* Restatement (Second) of Torts § 652(H) (claimant is entitled to recov-

---

**12.** The court in *United States v. Comprehensive Drug Testing, Inc.,* 513 F.3d 1085 (9th Cir.2008), addressed the propriety of investigators' seizure of professional baseball players' urine samples and test results. Although the court ultimately upheld the seizure, it expressly noted what it called the players' "strong privacy interests in both their drug test results and the actual specimens." *Id.* at 1104.

**13.** *See generally* Restatement (Second) of Torts § 904(I) (1979) ("'General damages' are compensatory damages for a harm so frequently resulting from the tort that is the basis of the action that the existence of the damages is normally to be anticipated and hence need not be alleged in order to be proved.").

er damages for "harm to his interest in privacy" as well as "his mental distress proved to have been suffered").

¶ 48 More generally, it has been held that "dignitary torts" such as those alleged by the Tribe do not require proof of physical manifestation of injury. *See, e.g., Rumbauskas v. Cantor,* 266 N.J.Super. 399, 629 A.2d 1359, 1362 (App.1993) ("[R]ecovery for harm to the plaintiff's interest in privacy does not depend on a showing of resulting mental distress ... the harm to plaintiff's interest in privacy is itself a loss to be compensated in damages."), *rev'd on other grounds,* 138 N.J. 173, 649 A.2d 853 (1994); *Snakenberg v. The Hartford Cas. Ins. Co., Inc.,* 299 S.C. 164, 383 S.E.2d 2, 6 (App.1989) (damage from wrongful intrusion into private affairs is "established as a matter of law" if elements of the tort are proved); 2 Dobbs, *Law of Remedies* § 7.3(2), at 305 (2d ed. 1993) (speaking generally of dignitary torts, "The tort is said to be damage in itself ...").

■■ ¶ 49 We do not cite these authorities as proof of the Tribe's claims or to establish any particular damage amount due the Tribe. We offer them instead to demonstrate the validity of the Tribe's contention that the privacy invasions it alleged naturally may give rise to deeply personal and subjective injury of the sort on which the Tribe based its settlement demand. Under the circumstances, whether or not its members suffered physical manifestations of that injury, the Tribe's notice of claim was not required to provide additional facts to support its settlement demand. *See generally Jones v. Cochise County,* 218 Ariz. 372, 377, ¶ 19, 187 P.3d 97, 103 (App.2008) (A.R.S. § 12–821.01 does not require "a precise accounting for each possible basis for damages" but "instead requires only that the claimant provide the facts supporting a lump sum award for those damages").[14]

### b. The Tilousi Plaintiffs' notices of claim.

#### (1) Whether the notices contained "facts supporting" the settlement demand.

■■ ¶ 50 As described above, the Tilousi Plaintiffs' August 14 notice of claim asserted that having obtained tribal members' blood samples ostensibly for a diabetes study, defendants misused the samples for other studies and published the results of those studies, all without consent. The claim notice, written by counsel for Tilousi, went on to say that ASU refused to disclose "any information regarding the use, handling or transfer" of the blood samples. The misuse of the claimants' blood samples constituted "a betrayal of trust with the Havasupai people and a violation of the original agreement" and a violation of the claimants' "privacy rights as well as their cultural, religious, and legal rights," counsel asserted. The letter continued that as a result of the alleged misconduct, plaintiffs suffered "severe harm, extreme distress, and emotional trauma." Counsel further stated that because of defendants' wrongful acts, the claimants worry about the possible uses and locations of their blood samples, worry about the violation of their religious values and beliefs, fear going to the health clinic, fear seeking medical attention and fear providing blood samples for medical diagnosis or treatment.

¶ 51 The November 6 notice of claim letter added that the claimants had learned that among the unauthorized research defendants permitted or conducted of tribal members' blood samples were "various studies to determine if ancestors of modern-day Havasupai people traveled across the Bering Strait land bridge from Asia eons ago." Counsel asserted that by defendants' unauthorized use of the blood samples, they had caused "emotional trauma" to the claimants and "violated our

14. The Tribe also argues its notices provided facts to support a claim for punitive damages. The general rule, however, is that a public entity is not liable for punitive damages. *See* A.R.S. § 12–820.04 (barring punitive damages against a public entity or "a public employee acting within the scope of his employment"); *see State v. Sanchez,* 119 Ariz. 64, 65–66, 579 P.2d 568, 569–70 (App.1978). Because the Tribe does not assert that its notices alleged any exception to this general rule, we may not conclude that the notices satisfied section 12–821.01 merely because they alleged repeated outrageous or reprehensible acts of the sort that otherwise might support a claim for punitive damages.

client[s'] privacy as well as their cultural, religious, and legal rights."

¶ 52 Like the Tribe's notices of claim described above, the Tilousi Plaintiffs' notices set forth "general damages," which by nature are subjective, deeply personal and often difficult to quantify. In their August 14 letter, the Tilousi Plaintiffs gave notice that they were willing to settle for $45,000 each and supported that amount with a description of specific anxieties and concerns they contended resulted from defendants' alleged wrongful acts. We conclude that for the reasons discussed above, the Tilousi Plaintiffs' notices of claim satisfied the requirement of A.R.S. § 12–821.01 to provide "the facts supporting" the settlement demand.

■■ ¶ 53 ABOR and the individual defendants argue that plaintiffs' stated "unspecified worry" and "generalized fear" were insufficient to justify the settlement they sought. As noted above, however, the test is not whether a notice of claim contains facts that justify or prove the amount of the settlement demand. Nor is it whether the facts demonstrate that the settlement demand is reasonable. Instead, it is whether the notice of claim, read as a whole, provides facts supporting the settlement demand.

¶ 54 Defendants argue the notices of claim were deficient because they did not provide all the facts they might have needed to evaluate plaintiffs' settlement demand. But, as noted above, ¶ 39, nothing in section 12–821.01 requires a claimant to provide all the facts pertaining to a damage claim or even all the facts that the claimant might know as of the time the notice is filed. A notice of claim merely triggers a process by which, at the election of the public entity and with the consent of the claimant, a negotiated settlement may occur. (Each of the four notices of claim the Tilousi Plaintiffs filed in this case invited the public entity to contact counsel.)

■■ ¶ 55 Defendants also argue that because the notices of claim did not specify which claimants experienced each of the vari-

ous symptoms of distress cataloged in the notices, the notices "did not provide any reasonable way for the defendants to evaluate the claims and decide whether to settle" with any of the claimants. As noted, however, when a notice of claim sets forth acts that give rise to presumed damages or to general damages that naturally flow from the tort, the statute does not require the claimant to detail the various ways in which stress, pain or suffering is manifested.

### (2) The Tilousi Plaintiffs' March 4 notice of claim.

■■ ¶ 56 ABOR and the individual defendants also argue the March 4 notice of claim is deficient because it did not state whether each individual claimant would have accepted a proportionate share of the $10 million demand to settle his or her separate claim. They also contend the March 4 letter was untimely because it was filed more than 180 days after the August 14, 2003 notice. Given that we have concluded that the August 14 letter, supplemented by the November 6 and December 29 letters, constituted valid notices of claim, the content and the timeliness of the March 4 notice is irrelevant to claims brought by individuals identified in the earlier notices.[15]

¶ 57 A question of fact remains, however, as to the timeliness of the March 4 notice of claim as it relates to any of the Tilousi Plaintiffs who were identified for the first time in that claim notice. Upon remand, the superior court may consider the timeliness of the March 4 notice of claim as to those plaintiffs. If the court finds the March 4 notice of claim timely as to those plaintiffs, it then may address the issue of whether the letter satisfies section 12–821.01 even though it states only a lump-sum settlement demand.

### 4. Other matters.

#### a. Timeliness of the Tribe's notices of claim.

■■ ¶ 58 As an alternative ground on which the judgment against the Tribe may be

---

**15.** The dissent argues that the Tilousi Plaintiffs' settlement demands increased over time without providing facts supporting "additional harms." ¶ 76, *infra*. We infer our colleague refers to the March 4 notice of claim, which sought a lump sum of $50 million in settlement (the August 14

notice had sought $45,000 per individual). Our decision that the August 14, November 6 and December 29 notices together satisfied A.R.S. § 12–821.01 moots the issue of the increase in the settlement demand stated in the March 4 notice.

affirmed, ABOR and Markow assert the Tribe's notices of claim were untimely because they were not served within 180 days of the date the Tribe's claims accrued.

¶ 59 Pursuant to section 12–821.01(B), "a cause of action accrues when the damaged party realizes he or she has been damaged and knows or reasonably should know the cause, source, act, event, instrumentality or condition which caused or contributed to the damage." When a cause of action accrues is "usually and necessarily" a question of fact for the jury. *Doe v. Roe*, 191 Ariz. 313, 323, ¶ 32, 955 P.2d 951, 961 (1998).

¶ 60 Defendants first argue the Tribe's claim accrued upon receipt of an April 29, 1997 letter from Martin, which stated in pertinent part:

> Some other genes suspected to underlie diabetes have also been studied in the Pimas and Dr. Markow and her colleagues were able to compare the Havasupai for two of these genes as well.... Low genetic variation became evident for the other genes as well when a graduate student ... looked at the genes controlling dopamine receptors. Scientists study dopamine receptors because of their possible role in other medical problems such as depression, schizophrenia, and movement control. Because Dr. Markow is well known for her work on inherited diseases such as schizophrenia, we were able to get funding for the dopamine receptor research which also paid for blood sampling for the diabetes work. Because Havasupais indicated ... they were not interested in additional behavioral medicine research, Dr. Markow did not go beyond research examining the level of variation in these genes in Havasupai.

¶ 61 Alternatively, defendants argue the Tribe's claims accrued no later than May 8, 2003, when the Tribe issued the banishment order, which announced that the Tribe had been informed that "research may have been conducted on Havasupai blood ... for purposes unrelated to diabetes." *See* ¶ 6, supra. Defendants contend the Tribe's claims must be dismissed because the Tribe filed no notice of claim stating a specific amount for which the claims could be settled within 180 days of either April 29, 1997 or May 8, 2003.

¶ 62 In response, the Tribe asserts that it did not discover the facts that triggered accrual of its claim until after it met with Hart on September 5, 2003, to hear the preliminary results of his investigation. It further contends defendants' fraudulent concealment of important facts foreclosed the Tribe's ability to file a proper notice within 180 days of the April 1997 letter or the May 2003 order.

¶ 63 Viewing the evidence in a light most favorable to the Tribe, a question of fact exists as to whether either the April 1997 letter or the May 2003 order demonstrates the Tribe realized it had been damaged and knew or should have known the cause of that damage.

### b. Proper service of the Tribe's notice of claim.

¶ 64 ABOR also argues that the Tribe's notice of claim was deficient because it was not served on the proper person and was not addressed to ABOR. Section 12–821.01(A) provides that a notice of claim "shall [be] file[d] ... with the person or persons authorized to accept service for the public entity or public employee as set forth in the Arizona rules of civil procedure." The applicable Rule of Civil Procedure ("Rule") is Rule 4.1(j), which addresses service of process on governmental entities:

> Service upon any governmental entity [other than the state, a county, municipal corporation or other governmental subdivision] shall be effected by serving the person, officer, group or body responsible for the administration of that entity *or by serving the appropriate legal officer, if any, representing the entity.* Service upon any person who is a member of the "group" or "body" responsible for the administration of the entity shall be sufficient.

(Emphasis added.) As noted, the Tribe's notices were delivered to Ward, vice president and general counsel of ASU, and to Assistant Attorney General Albrecht. Viewing the record in the light most favorable to the Tribe, the record demonstrates that at

the time of and in connection with this matter, Ward and Albrecht were "the appropriate legal officer[s] representing" ABOR. For example, on May 15, 2003, three months before the notice of claim, Ward signed the Joint Confidentiality and Cooperative Investigation Agreement as "counsel for Arizona State University and the Arizona Board of Regents." In addition, Ward and Albrecht attended meetings and/or signed documents on behalf of ABOR both before and after receiving the September 8 notice of claim.

**c. Whether the notices of claim failed because they did not state separate settlement demands made on each defendant.**

¶ 65 The defendants in both cases argue that the notices of claim were insufficient because they failed to state separate settlement demands made to each public entity or public employee accused of wrongdoing. As a consequence, defendants contend, each defendant was deprived of a meaningful opportunity to separately settle his, her or its portion of the claim.

¶ 66 As recounted above, the notices of claim alleged various acts committed by a group of purported wrongdoers, rather than specific acts performed by certain public entities or employees and other acts performed by others. Likewise, the damages plaintiffs claimed they incurred were non-differentiated; read fairly, the notices of claim alleged that the harm the claimants alleged resulted from all the alleged wrongful acts together. Defendants cite no authority for the proposition that when, as here, a claimant seeks damages arising from the same set of acts by multiple public entities and/or public employees, A.R.S. § 12–821.01 requires the claimant to assert separate settlement demands against each. Under these circumstances, we do not read A.R.S. § 12–821.01 to require that one who asserts a single claim against multiple public entities or employees must make separate settlement demands on each of the various alleged individual wrongdoers.

¶ 67 Markow relies on *Harris v. Cochise Health Systems*, 215 Ariz. 344, 160 P.3d 223 (App.2007), but that case requires only that where a notice identifies a claim against both a public employee and as a public entity, the claimant must serve the public employee as well as the public entity. The plaintiffs in these cases complied with that requirement.

¶ 68 Defendants also cite *Duke v. Cochise County*, 189 Ariz. 35, 938 P.2d 84 (App.1996), and argue that under Arizona Rule of Civil Procedure 68, an "undifferentiated, unapportioned settlement figure provides insufficient information and incentive" to allow an offeree to settle. In *Duke*, Division Two of this court vacated sanctions imposed based on an unapportioned offer of judgment pursuant to Rule 68. The court concluded that without knowing the amount each offeree could have settled for prior to trial, it was impossible for a court to determine whether each offeree fared better at trial. *Id.* at 41, 938 P.2d at 90. We also concluded the offer of judgment failed because the plaintiff "failed to apportion the amounts sought on her multiple claims for wrongful death, emotional distress, and false imprisonment, making it impossible for the County to assess its chances of doing better at trial against each claim." *Id.*

¶ 69 We disagree with defendants' contention that the logic of Rule 68 applies to A.R.S. § 12–821.01. A successful offer of judgment made pursuant to Rule 68 is the penultimate step before a settlement; the offer is either accepted or not, with consequences as provided by the Rule. Thus, an offer made pursuant to Rule 68 sets out a specific settlement offer in a manner that allows the offeree to finally decide whether to accept it or decline and proceed to trial. By contrast, a settlement demand in a notice of claim made pursuant to section 12–821.01 necessarily occurs prior to the commencement of litigation and usually is the first step in the process by which, if it chooses, the government may investigate and evaluate the claim and the settlement demand and negotiate a settlement. *See Deer Valley*, 214 Ariz. at 295, ¶ 6, 152 P.3d at 492. Because section 12–821.01's purposes are unrelated to those of Rule 68, we decline to extend Rule 68's more stringent requirements to notices of claim filed pursuant to section 12–821.01.

**d. The Tribe's motion for leave to amend.**

¶ 70 The superior court denied the Tribe's motion for leave to file a third-amended com-

plaint based on the court's conclusion that the claims asserted therein were barred due to the Tribe's failure to serve a proper notice of claim. Because we have reversed that ruling, we also vacate this portion of the court's decision.

¶ 71 The court also granted defendants' motion to strike the Hart Report as an exhibit to the complaint based on "the reasons set forth on the record at the September 25, 2006 hearing." We conclude the court did not abuse its discretion in striking the Hart Report as an exhibit to the complaint. Given the length and detail of that report, the court was within its discretion in concluding that notice pleading did not require it to be attached to the complaint.

## CONCLUSION

¶ 72 For the reasons set forth above, we reverse the superior court's summary judgment orders and remand for further proceedings consistent with this opinion.

CONCURRING: ANN A. SCOTT TIMMER, Chief Judge.

THOMPSON, Judge, dissenting.

¶ 73 The majority, relying primarily on *Backus v. State of Arizona,* 534 Ariz. Adv. Rep. 26, 29, ¶ 28, 220 Ariz. 141, 148, 204 P.3d 399, 406, 2008 WL 2764601 (App.2008) for the proposition that a claim "notice is sufficient if it contains 'any facts,'" concludes that the facts contained in the notices in these cases were good enough under A.R.S. § 12–821.01. Because I conclude that the opinion in *Backus* impermissibly read the requirement that the settlement demand be supported by facts out of the statute, I do not follow that opinion. Because the facts set forth in these cases did not support the settlements demanded, I would affirm the trial court's dismissals.

¶ 74 In *Backus* another panel of this court declined to evaluate the facts marshalled in ostensible support of a notice of claim, concluding that we cannot infer any standard of sufficiency into section 12–821.01. 534 Ariz. Adv. Rep. at 28, ¶ 19, 220 Ariz. at 146, 204 P.3d at 404. In doing so, in my view, the court lost sight of the "facts supporting"

requirement. In order for facts to "support" a settlement demand, those facts must "corroborate" (Random House Dictionary of the English Language 1913 (2d ed. 1987)) or "argue in favor of" (American Heritage Dictionary of the English Language 1739 (4th ed. 2000)) or "substantiate" (17 Oxford English Dictionary 258 (2d ed. 1989)) the amount of money sought in settlement. To say that "any facts" satisfy the statute ignores the logical force of the directive that only certain facts will be compliant, namely those facts that corroborate or advocate for or substantiate the settlement demand. To make this determination, we must in some measure evaluate the facts evinced in ostensible support of a settlement demand.

¶ 75 Following *Backus* in the refusal to subject the supporting facts in these cases to any evaluative standard, the majority here asserts that the allegations in these notices present information from which injury might be inferred, which injury is necessarily personal and subjective and difficult to quantify, and which injury need not be established with regard to dignatory torts because it is presumed. The common theme of the majority's observations here is that appellants need not show anything more than the fact of tort liability in their claim notices. But the statute is meant to allow the government "to realistically consider a claim," by requiring "that claimants explain the amounts identified in the claim by providing ... a factual foundation" for such an evaluation, which evaluation can lead to an expenditure of public funds in settlement. *Deer Valley Unified Sch. Dist. v. Houser,* 214 Ariz. 293, 296, ¶ 9, 152 P.3d 490, 493 (2007). To accomplish this, the supporting facts must logically relate to the incidence, nature, and severity of the damages suffered by the claimants. In short, the statute requires more than the majority posits. Perhaps it is sometimes difficult to put a number on individual suffering and relate that number to the specific facts of a given case, but the statute calls for it.

¶ 76 As the trial court noted, "[t]here is no explanation whatsoever [in] the letters regarding how the Tribe came up with its $50,000,000 demand" such that the state

could evaluate the reasonableness of the demand. Similarly, while the Tilousi plaintiffs' notices aver that some plaintiffs suffered some worries and fears and distress, the notices do not say what worries, fears, and distress were suffered by whom and to what degree these harms were suffered. Further, these plaintiffs' demands increased over time without any facts supporting additional harms. As real as these harms may well be, I cannot conclude that the government could responsibly settle these claims without the required statutory information.

¶ 77 Accordingly, I would affirm.